# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**
**No. 20-1649V**
UNPUBLISHED

| | |
|---|---|
| ANDREW PETERSON, | Chief Special Master Corcoran |
| Petitioner, | Filed: April 20, 2023 |
| v. | |
| SECRETARY OF HEALTH AND HUMAN SERVICES, | Special Processing Unit (SPU); Decision Awarding Damages; Pain and Suffering; Influenza (Flu) Vaccine; Shoulder Injury Related to Vaccine Administration (SIRVA) |
| Respondent. | |

*John Robert Howie, Howie Law, PC, Dallas, TX,* for Petitioner.

*Michael Joseph Lang, U.S. Department of Justice, Washington, DC,* for Respondent.

## DECISION AWARDING DAMAGES[1]

On November 23, 2020, Andrew Peterson filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleged that he suffered a left shoulder injury related to vaccine administration ("SIRVA") as a result of an influenza ("flu") vaccine received on January 8, 2019. Petition at 1. The case was assigned to the Special Processing Unit of the Office of Special Masters. Respondent conceded entitlement; but the parties have been unable to agree on the appropriate amount of damages.

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website , and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755.  Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

For the reasons set forth below, I find that Petitioner is entitled to an award of damages in the amount of **$131,233.02**, **$130,000.00 of which is for actual pain and suffering, plus $1,233.02 in unreimbursed out of pocket expenses.**

## I.      Relevant Procedural History

Petitioner filed medical records with his petition, and the case was activated on December 29, 2020 (ECF Nos. 6, 7, 11). On February 22, 2022, Respondent filed his report conceding entitlement, and a ruling on entitlement was entered the same day (ECF Nos. 29, 30). Thereafter, the parties negotiated, but reached an impasse that fall, proposing a damages briefing schedule to resolve the issue (ECF No. 48).

Petitioner filed his damages brief on November 16, 2022 (ECF No. 50). Respondent filed his responsive brief on December 16, 2022, and Petitioner replied on January 4, 2023 (ECF Nos. 51, 52). Following the completion of damages briefing, Petitioner continued to file updated medical records on February 7, 8, and 27, and April 11, 2023 (ECF Nos. 53-57). The matter of damages is now ripe for resolution.

## II.     Relevant Medical History

On January 8, 2019, Petitioner received a flu vaccine intramuscularly in his left deltoid. Ex. 2 at 3. The vaccine was administered at a Walgreens in Oakland Park, Florida. *Id*. at 4.

On February 13, 2019 (36 days after receiving the flu vaccine), Petitioner was seen by orthopedist Dr. Jonathan Hersch for left shoulder pain. Ex. 4 at 9. Petitioner reported that his pain began on January 8, 2019 after a flu shot at Walgreens. *Id*. at 10. He reported an aching, stabbing, sharp pain that was, at worst, eight out of ten. *Id*. The pain was aggravated by overhead motion. *Id*. On examination, his left shoulder exhibited tenderness of the greater tuberosity, trapezius, supraspinatus, infraspinatus, subacromial bursa, subdeltoid bursa, and the lateral cuff insertion. *Id*. at 11. His left shoulder active range of motion ("ROM") was 90 degrees in forward flexion, 60 degrees in external rotation at zero degrees of abduction, and 80 degrees in abduction.[3] *Id*. His left shoulder passive ROM was limited to 90 degrees in forward flexion with "too much pain," 80 degrees in external rotation, and 70 degrees in internal rotation. *Id*. His left shoulder had positive results on Hawkin's and Neer's impingement tests, and a positive empty can sign. *Id*. A left shoulder x-ray was normal. *Id*. Petitioner was assessed with pain of the left

---

[3] Normal shoulder ROM for adults ranges from 165 to 180 degrees in flexion, 170 to 180 degrees in abduction, 90 to 100 degrees in external rotation, and 70 to 90 degrees in internal rotation. Cynthia C. Norkin and D. Joyce White, MEASUREMENT OF JOINT MOTION: A GUIDE TO GONIOMETRY 72, 80, 84, 88 (F. A. Davis Co., 5th ed. 2016).

shoulder joint, and an ultrasound guided corticosteroid injection was administered. *Id.* at 11-12.

Petitioner returned to Dr. Hersch on February 27, 2019, reporting that his ROM had slightly improved, but his pain remained unchanged, especially with overhead motion. Ex. 4 at 8. On examination, his left shoulder active ROM had improved, with 150 degrees in forward flexion, 130 degrees in abduction. *Id.* at 9. His passive ROM in forward flexion had improved to 170 degrees, with pain, but remained unchanged in other planes of motion. *Id.* Dr. Hersch assessed Petitioner with impingement syndrome of the left shoulder, and ordered an MRI. *Id.*

Petitioner underwent a left shoulder MRI on March 15, 2019. Ex. 9 at 2. The MRI revealed an interstitial partial thickness tear of the supraspinatus, subacromial subdeltoid bursitis, and mild acromioclavicular joint hypertrophy. *Id.*

On March 25, 2019, Petitioner followed up with Dr. Hersch. Ex. 4 at 4. Dr. Hersch reviewed the MRI, which found no evidence of major pathology but some small signal change in the supraspinatus. *Id.* at 6. Dr. Hersch determined that surgery was not indicated, and recommended physical therapy ("PT"). *Id.*

Petitioner attended a PT evaluation on April 11, 2019. Ex. 10 at 19. He reported difficulty with dressing, bathing, reaching out, and lifting, with pain shooting down the side of his arm to his elbow. *Id.* He reported a pain level of nine out of ten. *Id.* The pain was worse with abduction and abduction, and he reported waking four or five times at night. *Id.* His left shoulder ROM was 90 degrees in forward flexion, 90 degrees in abduction. 10 degrees in external rotation, and 15 degrees in internal rotation, all of which were painful. *Id.* He had positive signs on the empty can test. *Id.* Petitioner attended approximately thirteen PT sessions, including the April 11 evaluation, between April 11 and June 7, 2019.[4] Ex. 10 at 20-31. From April 18 to June 7, Petitioner reported pain levels ranging from one to five out of ten. *Id.*

Petitioner returned to Dr. Hersch on July 10, 2019 to follow up concerning his shoulder pain. Ex. 4 at 2. He reported that he was not experiencing pain at rest. *Id.* at 3. However, he experienced pain a day or two after he exerted himself or increased activity. *Id.* He did not feel that PT had helped much. *Id.* Dr. Hersch reviewed the MRI again, and thought there could be a labral tear that did not show up. *Id.* at 4. He gave Petitioner the choice of a diagnostic arthroscopy or living with the discomfort, with a repeat MRI in a

---

[4] Respondent asserts that Petitioner attended twelve PT sessions during this time, while Petitioner claims there were thirteen. Petitioner's Brief Ex. 1 at 1; Respondent's Opposition at 3. I find that the difference is immaterial.

year. *Id.* There are no medical records concerning Petitoiner's shoulder for the next eight months.

On March 16, 2020, Petitioner was seen by Dr. Olga Maric for an annual wellness visit. Ex. 11 at 26. On an intake form, he reported his shoulder injury from the year before as a serious injury and important health concern. *Id.* at 24, 26. Labs were done, but it does not appear that further evaluation or treatment of his shoulder occurred at this visit. *Id.*

On April 9, 2020, Petitioner was seen by Dr. Diana Hodarnau to obtain a referral to Dr. Dannell Anschuetz, a physical medicine and rehabilitation specialist. Ex. 12 at 2. He reported left shoulder pain secondary to an injury a year earlier from a flu vaccine. *Id.* He reported that the flu vaccine had been "injected directly into his shoulder joint" rather than the muscle, and that PT had aggravated his pain. *Id.* He wanted a second opinion on treatment options other than surgery. *Id.* He reported intermittent pain that worsened after certain activities such as carrying a heavy weight or sleeping on his left side. *Id.* The pain usually started the following day, not immediately, and reached a level of nine out of ten at worst. *Id.* The pain was located in the lateral upper aspect of the left shoulder, and when severe it radiated down his left arm to the mid humerus or toward the neck. *Id.* Over the counter non-steroidal anti-inflammatory drugs ("NSAIDs") did not help. *Id.* If Petitioner was careful to avoid aggravating movements, he had either no pain or minimal pain of one out of ten. *Id.* On examination, his left shoulder ROM was normal, and he was able to place his left hand behind his back without difficulty or pain. *Id.* at 3. Dr. Hodarnau assessed Petitioner with left shoulder pain, and referred him to Dr. Anschuetz for a second opinion. *Id.* at 4.

Petitioner saw Dr. Anschuetz on August 27, 2020.[5] Ex. 13 at 2. Petitioner reported left shoulder pain after a flu shot the prior year, and "consistent pain" since then. *Id.* He reported that the flu shot was given "in the top of the shoulder not out in the middle of his muscle . . . near the bone." *Id.* He had significant pain initially, and consistent pain since then, currently at a level of two out of ten. *Id.* He reported pain when he lifted his shoulder, and his symptoms were worse with use or lifting greater than ten pounds. *Id.* For the first few months his pain was severe, but now was a deep ache. *Id.* He was unable to sleep on his left side. *Id.* On examination, his left shoulder ROM was noted as "abnormal," with 180 degrees in abduction, 50 degrees in adduction, 180 degrees in flexion, 50 degrees in extension, and 90 degrees in both internal and external rotation. *Id.* at 6. He had positive impingement signs, and negative signs on the drop arm and apprehension tests. *Id.* at 7. Dr. Anschuetz assessed him with pain in the left shoulder and muscle spasm. *Id.*

---

[5] Petitioner and Respondent both indicate that this visit was on May 13, 2020. Petitioner's Brief Ex. 1 at 3; Respondent's Opposition at 4. However, the record itself is dated August 27, 2020, and the record certification affidavit also has this date. Ex. 13 at 1-2.

Dr. Anschuetz recommended a referral to an orthopedist specializing in shoulders, possibly Dr. Routman or Dr. Levy, and recommended that Petitioner continue his home exercise program and consider a trial of gabapentin. *Id.*

Petitioner did not seek care for his shoulder again until ten months later, on June 23, 2021, when he saw orthopedist Dr. Alan Routman.[6] Ex. 15 at 3. Petitioner reported left shoulder pain resulting from an inappropriately administered flu shot in the winter of 2019. *Id.* He had seen a different orthopedist, had a steroid injection and MRI, and tried PT, without relief. *Id.* He continued to have left shoulder symptoms, although the symptoms were fairly tolerable if he did not use his shoulder much. *Id.* However, if he used his shoulder for any strenuous activity, a day or so afterward he developed pain that would continue for "several days or weeks." *Id.* He described the pain as a generalized pain that caused stiffness and loss of motion. *Id.* On examination, his left shoulder had normal active and passive ROM, with only mild tightness and stiffness at the extremes. *Id.* at 4. Testing his deltoid muscle caused mild discomfort. *Id.* He had no pain with crossover or impingement tests, and negative apprehension signs. *Id.* Dr. Routman reviewed the March 15, 2019 MRI and believed Petitioner had a paralabral cyst that may be causing generalized weakness due to a neurapaxic injury. *Id.* He discussed treatments including nonsteroidal agents, steroid injections, or PT, but Petitioner was not interested in pursuing these. *Id.* Dr. Routman ordered a repeat MRI. *Id.*

On June 30, 2021, Petitioner underwent a second MRI. Ex. 15 at 6. The MRI revealed minimal subacromial subdeltoid bursitis, minimal supraspinatus tendinopathy with interval healing of the previously demonstrated interstitial tear, and an otherwise intact rotator cuff. *Id.*

On September 21, 2021, Petitioner was seen by orthopedist Dr. Brian Hill for left shoulder pain that began two and a half years earlier due to a flu shot. Ex. 21 at 12-13. He had experienced several flareups, and his pain worsened when he slept on it. *Id.* He had one prior injection and some PT, which did not help. *Id.* He reported current pain of two out of ten, which could increase to eight or nine out of ten. *Id.* On examination, he had positive Neer's and Hawkin's impingement signs, and negative pain with resisted external rotation and negative Belly Press test results. *Id.* at 14. His Speed's and O'Brien's tests were negative. *Id.* Dr. Hill diagnosed Petitioner with left shoulder subacromial bursitis, and administered a steroid injection. *Id.* at 14-15.

---

[6] In his affidavit, Petitioner states that he returned to Dr. Routman in July 2021 after his second MRI, and was referred to Dr. Hill. Ex. 32 at ¶ 14. Petitioner states that he later learned that his attorney has unsuccessfully attempted to obtain a record of the July 2021 appointment with Dr. Routman, who has since retired. *Id.*

Petitioner returned to Dr. Hill a month later, on October 20, 2021. Ex. 21 at 16. The record states that Petitioner was directed to continue his home exercise plan, take anti-inflammatory medications for flare-ups in pain, and follow up as needed. *Id.* at 18-19. Then, on December 8, 2021, Dr. Hill performed left shoulder arthroscopic debridement and subacromial decompression under anesthesia on Petitioner. Ex. 21 at 20-21. The pre- and post-operative diagnoses were left shoulder subacromial bursitis. *Id.* Dr. Hill observed synovitis and fraying of the labrum, which he debrided. *Id.*

At Petitioner's first post operative appointment on December 21, 2021, he was doing well, with no complications. Ex. 21 at 23-24. He had developed a rash under his armpit. *Id.* His left shoulder wounds showed no signs of infection. *Id.* at 25. His left shoulder passive ROM was 90 degrees in forward flexion and 30 degrees in external rotation. *Id.* Petitioner was directed to start PT and follow up in four weeks. *Id.*

Petitioner underwent a post-operative PT evaluation on January 4, 2022. Ex. 23 at 23-25. He reported a current pain level of five out of ten, with pain ranging from three at best to nine at worst. *Id.* at 23. The pain was aggravated by placing his arm across his body or behind his back. *Id.* His left shoulder passive ROM was 128 degrees in flexion, 108 degrees in abduction, eight degrees in external rotation, and 22 degrees in internal rotation. *Id.* at 24. He was tender to palpation, and exhibited muscle guarding. *Id.* A treatment plan of two visits a week for eight weeks was established. *Id.* at 25. Petitioner attended 32 additional PT sessions between January 6 and April 25, 2022. Exs. 23 at 28-72; 25 at 56-80.

Petitioner returned to Dr. Hill on February 2, 2022 for a follow up visit. Ex. 22 at 13. Petitioner was now doing well, with no complications or problems with his surgical wounds. *Id.* at 14. He was given a new PT prescription for "aggressive range of motion," and directed to follow up in four weeks. *Id.* at 15. On March 2 and April 26, 2022, Petitioner had follow up appointments with Dr. Hill. Exs. 22 at 16; 25 at 4. He continued to do well, with no complications, and thought he was making some progress in PT. Ex. 22 at 17. Dr. Hill directed him to continue PT and his home exercise plan. *Id.*

On June 21, 2022, Petitioner followed up with Dr. Hill. Ex. 27 at 6. He reported that he had limited pain and was working on ROM. *Id.* at 7. On examination, his left shoulder passive ROM was 150 degrees in forward flexion and 40 degrees in external rotation. *Id.* at 9. Dr. Hill directed him to continue his home exercise program and return to the office as needed. *Id.*

Eight days later, on June 29, 2022, Petitioner saw Dr. Hodarnau, requesting PT for left shoulder pain caused by frozen shoulder. Ex. 31 at 9. He reported that he had done all the PT his insurance would reimburse for the year, and that Dr. Hill did not want

to order more PT and dismissed him. *Id.* His pain was constant, at best one or two out of ten, and at worst nine out of ten. *Id.* He was unable to sleep on his left side, and if he turned onto his left side in his sleep pain would awaken him. *Id.* He continued to do home exercises, and the pain worsened afterward. *Id.* Rest helped, but too much rest resulted in stiffness. *Id.* He had decreased ROM, especially in external rotation. *Id.* Advil helped with pain, but Petitioner worried that taking too much would damage his stomach. *Id.* Voltaren gel did not help with the pain. *Id.* He had called his insurer and they agreed to pay for a PT evaluation of his left shoulder, but not more PT sessions. *Id.* On examination, he had no tenderness to palpation over his left shoulder. *Id.* at 11. He was able to lift his left arm above his head to 170 degree and place his left arm behind his back, but with some difficulty and pain. *Id.* Impingement signs were negative. *Id.* Dr. Hodarnau referred him to PT and prescribed a Medrol Dosepak. *Id.*

On July 6, 2022, Petitioner reported to PT. Ex. 28 at 2. He stated that he had been doing his home exercise plan, but continued to experience pain after active use of his left arm and felt that his motion was limited. *Id.* On examination, his left shoulder active ROM was 150 degrees in flexion, 170 degrees in abduction, 45 degrees in extension, 33 degrees in external rotation, and 88 degrees in internal rotation. *Id.* at 2-3. Petitioner was advised to attend PT twice a week for eight weeks. *Id.* at 8. Petitioner returned to PT on August 10, 2022, reporting a pain level of four. Ex. 29 at 5, 7. He attended five additional sessions between August 16 and September 6, 2022. *Id.* at 13-21.

On January 3, 2023, Petitioner returned to Dr. Hodarnau for left shoulder pain and an unrelated condition. Ex. 34 at 6. He requested a PT referral for his left shoulder, reporting that PT helped with his ROM. *Id.* His left shoulder pain was unchanged and remained intermittent, and continued to be worse with activity or sleeping on his left side and better with rest. *Id.* Dr. Hodarnau referred him to PT. *Id.* at 8.

On January 17, 2023, Petitioner underwent a PT evaluation. Ex. 35 at 2. He reported continued pain with movement and sleeping on his left side. *Id.* He had almost full ROM and wanted to continue to improve on this. *Id.* His current, and lowest, pain level was two out of ten, and at worst ranged to nine out of ten. *Id.* On examination, his left shoulder active ROM was 160 degrees in flexion, 165 degrees in abduction, and 65 degrees in external rotation. Petitioner attended 12 more PT sessions between January 24 and March 30, 2023. Exs. 35 at 7-11; 37 at 2-10; 38 at 3-9.

## III.   Affidavit Evidence

Petitioner filed two sworn statements in support of his claim. Exs. 1 and 32. Petitioner states that when he received the January 2019 flu vaccine, he noticed it was extremely high on his left arm and took an inordinate amount of time to be injected. Ex. 1

at ¶ 4. It did not immediately concern him; however, within ten minutes, he began to experience worsening pain. *Id.* He initially believed that he was experiencing routine post-vaccination pain. *Id.* However, when it continued, he decided to see an orthopedist *Id.*

In July 2019, Dr. Hersch advised that he could consider a diagnostic arthroscopy or simply live with the pain and have a repeat MRI in a year. Ex. 1 at ¶ 15. Over the next few months, he continued to experience pain that interfered with daily activities, but attempted to self-treat with over the counter pain remedies in hopes that his symptoms would resolve on their own. *Id.* at ¶ 16. However, the pain persisted. *Id.*

Petitioner states that when he saw Dr. Maric in March 2020, she indicated that she would provide a specialist referral, but he did not receive it. Ex. 1 at ¶¶ 17-18. Thereafter, he decided to seek a referral from another doctor, and saw Dr. Hodarnau, who referred him to Dr. Anschuetz. *Id.* at ¶ 18.

Petitioner asserts that he experiences shoulder pain with everyday activities such as lifting a gallon of water, carrying groceries, riding a bike, sleeping on his left side, or stretching with his arm. Ex. 1 at ¶ 20. He states that his persistent shoulder pain has affected his ability to work. *Id.*

In his second sworn statement dated November 16, 2022, Petitioner asserts that his injury has caused pain and limited ROM for nearly four years. Ex. 32 at ¶ 2. He states that it is "rare for me to get through an entire week without shoulder pain in the 8-9 out of 10 range at some point." *Id.* at ¶ 15. He explained that lifting more than five or ten pounds, or reaching with full or nearly full extension from the body results in pain approximately 24 hours later that continues for one to five days. *Id.* at ¶ 2. Once his shoulder is irritated, the only way to alleviate the discomfort is to cease all activity and use ice, heat, massage, rest, and NSAIDS for multiple days until the pain subsides. *Id.*

Petitioner adds that in reviewing his pre-surgical PT records, he determined there had been a "disconnect" between his physical therapist and him about the level of pain he was experiencing. Ex. 32 at ¶ 3. He explained that he experienced a delayed pain triggered by physical activity of eight to nine in severity that was not reflected in the PT records, which recorded only his pain before or during the session. *Id.*

Petitioner states that his condition today is worse than it was prior to surgery, which was his greatest fear about having surgery. Ex. 32 at ¶¶ 3-4. He explained that his post-surgical PT occurred on Tuesdays and Thursdays, and that his therapist did stretching and ROM on Tuesdays and strength on Thursdays, which allowed a full five days of recovery from strength work. *Id.* at ¶ 4. On weeks that his pain was especially bad, they would skip strength work on Thursday to allow a full two weeks to recover. *Id.* Petitioner

believes this helped him make good progress and that his pain levels, but not his ROM, have returned to pre-surgical levels. *Id.*

Petitioner described seeking medical care for SIRVA as "an extremely frustrating experience." Ex. 32 at ¶ 5. He explained that most of his providers did not recognize SIRVA as a legitimate diagnosis and he has had difficulty receiving appropriate treatment. *Id.* Petitioner explained that he had not sought opioid pain medication for his pain, asserting that doctors in Florida, where he lives, refuse to prescribe narcotics even if they are requested and the patient is in extreme pain. *Id.* at ¶ 12. He states that instead, doctors offer steroid injections, and the two such injections he had did not provide any long-term symptom relief. *Id.*

He explained that the treatment gap from July 2019 to March 2020 was due to Dr. Hersch suggesting that his injury would improve with time, waiting for his new insurance policy to begin in 2020, and a delay in having a new PCP assigned and then obtaining an appointment with her. Ex. 32 at ¶¶ 6-7.

Petitioner stated that his injury has had a profound impact on him physically, mentally, socially, and financially. Ex. 32 at ¶ 9. He stated that he was called to report for work with the Census Bureau in the spring of 2019, and again in February and March of 2021, but that he was unable to accept a position due to his shoulder pain and inability to use his left arm. *Id.* He explained that he had been an active person for most of his life, and that "the loss of the benefits from physical activity cannot be overstated." *Id.* at ¶ 10. He has had to reduce or eliminate things such as playing with his niece and nephews and outdoor games. *Id.*

## IV.    The Parties' Arguments

The parties agree that Petitioner should be awarded $1,233.02 for unreimbursed out of pocket expenses. Petitioner's Brief ("Br.") at 1; Respondent's Brief in Opposition ("Opp.") at 12. But they are far apart in their views of what Petitioner should receive for actual pain and suffering and emotional distress.

Petitioner requests $150,000.00 in pain and suffering. Br. at 1. Petitioner asserts that he suffered a serious injury that had a significant impact on his life. Br. at 42. Petitioner proposes that the decision in *Gunter*[7] (awarding $125,000.00 for pain and suffering) should set the "floor" in terms of potential damages awards in this case, and

---

[7] *Gunter v. Sec'y of Health & Human Servs.*, No. 17-1941V, 2020 WL 6622141 (Fed. Cl. Spec. Mstr. Oct. 13, 2020).

that *S.C.*[8] and *Reed*[9] (both involving awards of $160,000.00 for pain and suffering) should set the "ceiling." *Id.* at 42-53. Petitioner also relies on *Jahn*,[10] in which $135,000.00 was awarded.

Petitioner asserts that both this case and *Gunter* are similar, since both involve a prolonged timeframe of conservative treatment and a treatment gap of over a year prior to surgery. Br. at 43-48. However, Petitioner emphasizes that in this case, he sought care sooner and the records document the pain levels experienced, while the *Gunter* petitioner did not seek care until twelve weeks after vaccination and "the *Gunter* opinion . . . is nearly completely devoid of any mention of pain scales or pain descriptions." *Id.* at 45. Indeed, "it was not until **two full years after her vaccination** before the petitioner in *Gunter* experienced pain that rose to such a level that it awakened her at night." *Id.* at 46 (emphasis added).

Here, by contrast, Petitioner reported pain waking him four to five times a night within three months of vaccination. Br. at 46. Petitioner infers that what he describes as the "near complete lack of any reference in *Gunter* to elevated pain persisting beyond the initial report of pain at a 4/5 . . . is compelling evidence to suggest that the pain levels experienced by the petitioner in *Gunter* were nominal at best." *Id.* Petitioner adds that the *Gunter* petitioner was not in excellent health at the time of vaccination, having just undergone surgery for cancer. *Id.* at 48. Petitioner speculates that the petitioner in *Gunter* "apparently voluntarily chose to conclude her medical care for her shoulder," while he ceased PT only because his insurance would not pay for further sessions. *Id.*

Petitioner cites *Jahn* as a case involving a comparable injury and treatment course. Br. at 49. Although the *Jahn* petitioner sought care sooner (only 12 days after vaccination), she "did not return for additional treatment for a 28-month period of time during which she was pregnant and gave birth to her daughter." *Id.* Otherwise, Petitioner acknowledges that "his case is not quite as severe as other SIRVA cases," including *S.C.* and *Reed*, although he seeks an award approaching what was ordered in those cases. Br. at 52.

More generally, Petitioner argues that his medical records do not fairly represent his actual pain levels. Br. at 3. He asserts that he experienced a delayed onset of pain

---

[8] *S.C. v. Sec'y of Health & Human Servs.*, No. 19-341V, 2021 WL 2949763 (Fed. Cl. Spec. Mstr. June 14, 2021).

[9] *Reed v. Sec'y of Health & Human Servs.*, No. 16-1670V, 2019 WL 1222925 (Fed. Cl. Spec. Mstr. Feb. 1, 2019).

[10] *Jahn v. Sec'y of Health & Human Servs.*, No. 18-0613V, 2021 WL 6550870 (Fed. Cl. Spec. Mstr. Dec. 17, 2021).

after activity, and asserts that to characterize his pain levels as falling between zero and three during the April-June 2019 time period would not be a fair and accurate depiction of his actual pain levels during this timeframe. *Id.* at 3-5.

Respondent proposes an award of $80,000.00 in pain and suffering. Opp. at 7. Respondent argues that Petitioner's pain and suffering was mild to moderate, and limited. *Id.* at 8. Respondent cites Petitioner's "delay in seeking treatment, mild to moderate self-reported pain ratings, and mild deficits on physical exam." *Id.* Respondent adds that throughout his treatment, Petitioner reported mild to moderate levels of pain, and concerning that Petitioner's assertion that his pain levels were higher in the days following PT, asserts "those concerns are not documented in his contemporaneous medical records with his physical therapist." *Id.* at 9. Respondent views the records as indicating that any increased pain was intermittent and sporadic. *Id.*

Respondent further emphasizes Petitioner's gaps in treatment, noting that after his first round of PT and fourth orthopedic visit, Petitioner did not seek any treatment for approximately eight months, and that after three visits from March to May 2020, he did not seek treatment again for thirteen months,[11] until June 2021. Opp. at 9. This suggests "that he was able to cope with his limited pain and suffering during these times without medical intervention." *Id.*

Respondent also argues that the cases Petitioner relies on are distinguishable. Opp. at 10. The petitioner in *Gunter,* for example, underwent one additional steroid injection and resumed treatment after one 13 month gap, compared to the petitioner in this case with two steroid injections and two treatment gaps. *Id.* The *Jahn* petitioner sought care sooner, only 16 days after vaccination compared to 36 days in this case. Opp. at 10. In addition, Respondent notes that the petitioner in *Jahn* "had a more compelling reason for the absence of treatment – her pregnancy and need to care for her newborn child," noting that no such explanation has been provide din this case. *Id.* at 11.

Instead, Respondent maintains that this case warrants an award "below the lowest value surgical cases to date," citing *Hunt*[12] (with a $95,000.00 pain and suffering award) and *Shelton*[13] (awarding $97,500.00 for pain and suffering). Opp. at 11-12. Respondent acknowledges that the petitioner in this case attended more PT sessions than the *Hunt*

---

[11] Because Petitioner's appointment with Dr. Anschuetz was in August 2020, not May, this gap in treatment was ten months rather than thirteen.

[12] *Hunt v. Sec'y of Health & Human Servs.*, No. 19-1003V, 2022 WL 2826662 (Fed. Cl. Spec. Mstr. June 16, 2022).

[13] *Shelton v. Sec'y of Health & Human Servs.*, No. 19-279V, 2021 WL 2550093 (Fed. Cl. Spec. Mstr. May 21, 2021).

petitioner, but argues that *Hunt* involved an additional steroid injection, more significant pain levels, and greater reported difficulties in performing daily activities, and did not involve significant treatment gaps as are present in this case. *Id.* Respondent acknowledges that the *Shelton* petitioner delayed seeking care for five months, but asserts this was followed by significant and consistent treatment for a year for a moderately severe SIRVA. *Id.* at 11.

Petitioner replies that Respondent misstates the facts in characterizing his treatment as involving only two injections and two months of post-surgical PT. Petitioner's Reply ("Reply") at 2-3. Rather, Petitioner asserts that he attended approximately 43 post-surgical PT sessions spanning nine months. *Id.* at 3.[14] Petitioner takes issue with Respondent excusing the 28 month treatment gap in *Jahn*, noting that while the *Jahn* petitioner was pregnant and caring for a newborn during this time, she did seek care for other ailments during this time. *Id.* at 4. Thus, Petitioner asserts that it is disingenuous to suggest that the entire 28 month gap can be excused by pregnancy and newborn care. *Id.*

Petitioner argues that *Shelton* and *Hunt* are not comparable cases. Reply at 5-14. Petitioner asserts that not only did the *Shelton* petitioner delay seeking care for five months, but when she did seek care, she was advised to pursue an MRI and did not do so or seek other care for another three months. *Id.* at 6-7. Petitioner argues that his active treatment course spanned over twice as long as that of the *Shelton* petitioner, who he states received significant pain relief from steroid injections, while he did not. *Id.* at 7, 9. And the *Hunt* petitioner's treatment course was only fifteen months, while Petitioner herein underwent active treatment totaling 23 months, excluding the treatment gaps. Reply at 12-14. The *Hunt* petitioner also had significant relief from steroid injections, while he received only slight relief, if any, and the *Hunt* petitioner had a successful surgery requiring only minimal post-surgical treatment. *Id.* at 14.

## V.    Legal Standard

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4).

Additionally, a petitioner may recover "actual unreimbursable expenses incurred before the date of judgment awarding such expenses which (i) resulted from the vaccine-related injury for which the petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other

---

[14] I note that since the briefing was completed, Petitioner has resumed PT and thus the number of sessions and duration have increased.

remedial care, rehabilitation . . . determined to be reasonably necessary." Section 15(a)(1)(B). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Human Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no mathematic formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Human Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("[a]wards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Human Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (citing *McAllister v. Sec'y of Health & Human Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

I may also consider prior pain and suffering awards to aid my resolution of the appropriate amount of compensation for pain and suffering in this case. *See, e.g., Doe 34 v. Sec'y of Health & Human Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). And, of course, I may rely on my own experience (along with that of my predecessor Chief Special Masters) adjudicating similar claims. *Hodges v. Sec'y of Health & Human Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated that the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims).

Although pain and suffering in the past was often determined based on a continuum, as Respondent argues, that practice was cast into doubt by the Court several years ago. *Graves v. Sec'y of Health & Human Servs.,* 109 Fed. Cl. 579 (Fed. Cl. 2013). The *Graves* court maintained that to do so resulted in "the forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly." *Id.* at 589-90. Instead, *Graves* assessed pain and suffering by looking to the record evidence, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program. *Id.* at 593-95. Under this alternative approach, the statutory cap merely cuts off *higher* pain and suffering awards – it does not shrink the magnitude of *all* possible awards as falling within a spectrum that ends at the cap

### VI.     Appropriate Compensation for Petitioner's Pain and Suffering

The record reflects, and the parties do not dispute, that at all times Petitioner was a competent adult with no impairments that would impact his awareness of his injury. Therefore, I analyze principally the severity and duration of Petitioner's injury.

Petitioner's treatment, including his surgery and ongoing PT, spanned approximately four years. There have been two significant gaps in treatment of eight and ten months, for which Petitioner has provided some explanation.

As Petitioner acknowledges, there is some disparity between what is documented in Petitioner's medical records and his sworn statements with respect to his pain levels. Petitioner has attempted to bridge this gap in briefing, but ultimately I find the medical records most compelling. *Cucuras v. Sec'y of Health & Human Servs*., 993 F.2d 1525, 1528 (Fed. Cir. 1993) ("Medical records, in general, warrant consideration as trustworthy evidence"). The medical records support Petitioner's claim that he experienced flare ups of his pain that could spike to a pain level of nine out of ten. They do not, however, support Petitioner's suggestion that this occurred on a weekly basis for four years.

Overall, Petitioner experienced a relatively mild injury – albeit one that required surgery. Initially, he had moderate restrictions in ROM, but these improved relatively quickly with his first cortisone injection and PT. His pain levels were moderate to severe when he first sought treatment. However, it was not long before his pain receded to mild levels, with intermittent flare ups. This, combined with the lengthy time between vaccination and surgery – almost three years – suggests that Petitioner's injury had a less severe but persistent nature. The second MRI showed some healing, objectively demonstrating that Petitioner's shoulder had improved with time and conservative treatment prior to surgery.

I find this case to be most similar to one of Petitioner's proposed comparable "floor" case, *Gunter*[15] – but also to *Monson v. Sec'y of Health & Human Servs*., No. 20-1350V, 2023 WL 2524059 (awarding $155,000.00 for pain and suffering), which was decided after the parties submitted their damages briefs in this case. Comparing this case to *Gunter*, while this Petitioner sought treatment sooner and for a longer duration, his injury improved more quickly and was less severe. Mr. Peterson also underwent more PT and

---

[15] I do not agree with Petitioner's suggestion that his pre-vaccination excellent health, contrasted to the *Gunter* petitioner's contemporaneous health problems, merits a higher award; the degree of pain and suffering herein can be determined by focus on Petitioner's post-vaccination experience, and factors specific to a petitioner's prior health deserve more weight when it is demonstrated that an injury worsened an existing burden (say, a preexisting illness made more difficult to bear) than when it is merely maintained that the injury did not exist pre-vaccination.

treated for longer, suggesting a longer duration of pain. I also find that Petitioner's injury is less severe than *Jahn*, and the award should be accordingly lower.

Petitioner and the *Monson* petitioner experienced a similar overall duration of injury, and both had surgery approximately three years after their injury. The *Monson* petitioner had a more serious injury, but did not seek care as promptly, in part due to a contemporaneous cancer diagnosis and treatment. However, in this case there were two treatment gaps of significant duration that support a much lower award.

The cases Respondent relies on, *Hunt* and *Shelton*, involved a much shorter injury duration and significant treatment delay, respectively. Not only are these cases not comparable, but Respondent proposes a lower award than these cases, without any precedent in support.

**I thus find that $130,000.00 represents a fair and appropriate amount of compensation for Petitioner's actual pain and suffering**.

### Conclusion

For all of the reasons discussed above and based on consideration of the record as a whole,[16] **I award Petitioner a lump sum payment of $131,233.02 (comprised of $130,000.00 in actual pain and suffering and $1,233.02 in unreimbursed out of pocket expenses), in the form of a check payable to Petitioner.**

The Clerk of Court is directed to enter judgment in accordance with this Decision.[17]

**IT IS SO ORDERED.**

<u>s/Brian H. Corcoran</u>
Brian H. Corcoran
Chief Special Master

---

[16] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required. *See* Section 15(f)(4)(A); *Childers v. Sec'y of Health & Hum. Servs.*, No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Hum. Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

[17] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.